IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LINDSAY O'BRIEN QUARRIE,

     Plaintiff,

v.                                              Civ. No. 17-350 MV/GBW

STEPHEN WELLS, et al.,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion for Reconsideration of the Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Sanctions [Doc. 368], Plaintiff's Motion for Reconsideration of the Court's Order Granting Motion to Quash Subpoena and Granting in Part Motion for Protective Order [Doc. 385], and Defendants' Motion for Rule 11 Sanctions [Doc. 400].  The Court, having considered the motions, attendant briefing, and all relevant law, will DENY Plaintiff's motions and GRANT Defendants' motion.

## BACKGROUND

From 2009 to 2012, Plaintiff was enrolled in a PhD program in Materials Engineering with Defendant New Mexico Institute of Mining and Technology ("NMT").  Third Amended Complaint ("TAC") [Doc. 150] ¶ 12.  Lorie Liebrock, Dean of Graduate Studies during the relevant period, informed Plaintiff that he was terminated from the graduate program in a letter dated April 27, 2012 (hereinafter, "Termination Letter").  *Id.* ¶ 27 & Ex. D.  In April 2013, Plaintiff filed a lawsuit in federal court against NMT, which was ultimately dismissed.  *Quarrie v. N.M. Inst. of Mining & Tech.*, Civ. No. 13-349 MV/SMV (D.N.M. Jan. 6, 2015).  After Plaintiff appealed the dismissal to the Tenth Circuit, the parties entered into settlement

negotiations.  TAC ¶ 47.  On October 8, 2015, the parties executed a settlement agreement and

mutual release of all claims that either party could raise against the other (hereinafter,

"Settlement Agreement").  Doc. 325-1.  Pertinent to Plaintiff's claims in the present case, the

Settlement Agreement contained the following provision:

> The Parties agree that the Office of Registrar of [NMT] will permanently remove
> the words "TERMINATED FROM GRADUATE PROGRAM" (or any similar
> language) from Plaintiff's [NMT] transcript, as well as from any other related
> documents in Plaintiff's academic and/or administrative files at [NMT], within
> five (5) business days from the execution of this Settlement Agreement.  The
> Parties further agree that no such language shall ever be added to Plaintiff's
> [NMT] transcript (or to any other related documents in Plaintiff's academic
> and/or administrative files at [NMT]) at any future time by Defendants.

*Id.* at 3.

Plaintiff filed the present suit on March 20, 2017 and filed his Third Amended Complaint

on August 6, 2019.  Plaintiff brings claims of racial discrimination in violation of Title VI of the

Civil Rights Act of 1964.  TAC ¶¶ 82–100.  Underlying Plaintiff's claims is an assertion that the

parties' Settlement Agreement is void.  TAC ¶ 53 & Ex. F.  As one reason why, Plaintiff alleges

that on or about May 26, 2016, he personally inspected his academic and/or administrative files

at NMT and discovered that NMT had not removed all language similar to "TERMINATED

FROM GRADUATE PROGRAM."  TAC ¶ 55.  Specifically, Plaintiff discovered among his

files several copies of the Termination Letter.  TAC, Ex. F.  Plaintiff argues that Defendant

NMT's failure to remove all copies of the Termination Letter from his files was a violation of the

Settlement Agreement that rendered it "void, invalid and unenforceable."  TAC ¶ 55.

After Plaintiff filed his Third Amended Complaint, Magistrate Judge Wormuth held a

Rule 16 scheduling conference and established pretrial deadlines including an initial discovery

deadline of March 2, 2020.  Doc. 166 at 1.  In the subsequent months, the parties engaged in a

lengthy and contentious discovery period, which ultimately closed on October 17, 2020.  *See*

Doc. 382 at 17.  During the course of discovery, Plaintiff sought further information concerning the Termination Letter and its presence in Plaintiff's academic and/or administrative files at NMT.  Doc. 278-3 at 4.  In addition to establishing that the Termination Letter was not removed from his files within five business days of the execution of the Settlement Agreement, Plaintiff sought information to flesh out his theory that "Defendant NMT has spoliated Plaintiff's NMT academic and/or administrative files by removing/transferring copies of the [Termination Letter] from those files since the instant case began in March of 2017 in an attempt to hide the evidence that Defendants have been in violation of the Settlement Agreement."  Doc. 278 at 15.

After extended motions practice, the following relevant facts were attested under oath by Defendant NMT in response to Plaintiff's interrogatories: (1) Plaintiff's academic and/or administrative files at NMT contained one or more copies of the Termination Letter as late as August 2017, Doc. 338-3 at 4; (2) the copies of the Termination Letter were transferred from Plaintiff's academic records by the former Registrar of NMT, Sara Grijalva, to a legal file, *id.*; (3) the transfer of the Termination Letter was initiated on the advice of Defendants' counsel, Doc. 325-12 at 5; and (4) email correspondence relating to the Termination Letter was never in any file regarding Plaintiff except a legal file, Doc. 338-3 at 4.  In addition, Defendant NMT admitted to the following relevant facts: (1) at least one copy of the Termination Letter was in Plaintiff's NMT academic and/or administrative files on May 26, 2016, Doc. 338-1 at 2; and (2) at least one document was removed or transferred from Plaintiff's NMT academic and/or administrative files after this suit commenced in March 2017, Doc. 325-18 at 3.

**LEGAL STANDARD**

Motions for reconsideration are not expressly recognized by the Federal Rules of Civil Procedure. *Trujillo v. Bd. of Educ. of Albuquerque Pub. Sch.,* 229 F.R.D. 232, 234 (D.N.M.

2005) (citing *Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, 312 F.3d 1292, 1296 n.3 (10th Cir. 2002)).  When a party moves for reconsideration of a final order, that motion is treated as a Rule 59(e) or 60(b) motion, depending on its timing.  *See Computerized Thermal Imaging*, 312 F.3d at 1296 n.3.  A motion for reconsideration of a non-final (i.e., interlocutory) order "may be revised at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b); *Trujillo v. Bd. of Educ. of Albuquerque Pub. Sch.*, 212 F. App'x 760, 765 (10th Cir. 2007) (unpublished).  Reconsideration of an interlocutory order is warranted when the court has made an error of fact or of law.  *Todd v. Montoya*, 791 F. Supp. 2d 1060, 1062 (D.N.M. 2011) (citing *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).

Plaintiff does not cite Rule 54(b), nor Rules 59 or 60.  Instead, Plaintiff brings his motions for reconsideration under Rule 72(a).  Doc. 368 at 4; Doc. 385 at 1.  Rule 72(a) permits a party to file objections to a magistrate judge's order on any nondispositive matter and have his objections considered by the district judge presiding over the case.  Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A).  Accordingly, the Court construes Plaintiffs' motions as objections to Magistrate Judge Wormuth's orders, which Plaintiff asks this Court to review.

On reviewing a party's objections, the district judge must "modify or set aside any part of the order that is clearly erroneous or is contrary to law."  Fed. R. Civ. P. 72(a).  The "clearly erroneous" standard requires affirmance unless the district judge "is left with the definite and firm conviction that a mistake has been committed."  *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  Review pursuant to a "contrary to law" standard is plenary; however, "it is extremely difficult to justify alteration of the magistrate judge's non-dispositive actions by the district

judge."  12 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3069 (3d ed. 2020).

## ANALYSIS

### I.    Motion for Reconsideration [Doc. 368]

On June 8, 2020, Plaintiff filed a Motion for Discovery and Spoliation Sanctions.  Doc. 325.  Plaintiff argued that Defendant NMT failed to provide complete responses to Plaintiff's written discovery requests as Magistrate Judge Wormuth had previously compelled it to do.  *Id.*; *see* Doc. 308.  Plaintiff sought sanctions under Rule 37 for Defendant NMT's alleged violations of the earlier order, including spoliation sanctions and an order that the "voidance, invalidity, and unenforceability of the Settlement Agreement . . . be taken as established."  Doc. 325 at 26.

On August 3, 2020, Magistrate Judge Wormuth issued an order granting in part and denying in part Plaintiff's motion (hereinafter, "August 3 Order").  Doc. 353.  Although the Magistrate Judge found that Defendant NMT's supplemental response to one discovery request was still insufficient, he denied Plaintiff's motion as to all other responses.  *Id.* at 28.  Because the insufficiency of Defendant NMT's supplemental response was minimal and nonprejudicial, the Magistrate Judge declined to impose any sanctions.  *Id.* at 29. Additionally, while expressing doubt that the transfer of documents to a legal file constitutes "alteration" for purposes of spoliation, the Magistrate Judge ultimately concluded that Defendant NMT's admission that the Termination Letter was removed more than five days after execution of the Settlement Agreement rendered any theoretical spoliation unprejudicial.  *Id.* at 27–28.

Plaintiff filed a Motion for Reconsideration of the August 3 Order on August 14, 2020. Doc. 368.  Plaintiff's central argument is that the August 3 Order is "clearly erroneous in light of new evidence that became available on July 30, 2020, when Plaintiff deposed the non-party

witness Sara Grijalva." *Id.* at 2. This contention is logically flawed. Plaintiff's original motion was filed on June 8, 2020, before this "new evidence" came into existence. This motion for reconsideration is the first occasion in which Plaintiff has shared this evidence with the Court. The "clearly erroneous" standard cannot permit overruling a magistrate judge's order on the basis of evidence that was never before him. *See Schmidt v. Navistar, Inc.*, No. 18-321 KG/JFR, 2020 WL 3542324, at *2 (D.N.M. June 30, 2020) (unpublished).

Although Rule 72(a) is not a proper mechanism for consideration of this evidence, the Court nonetheless has considered it. Plaintiff asserts that several facts established by Ms. Grijalva prove that Defendant NMT perjured itself multiple times in its written discovery responses. These facts, as related by Plaintiff, are as follows:

(i)     As Registrar of NMT, Ms. Grijalva never transferred a copy of [the Termination Letter] to a legal file at NMT but instead transferred a copy of it to a non-legal "secure file room" after being instructed to do so by attorney Christa Hazlett.

(ii)    Ms. Grijalva cannot confirm the veracity of Defendant NMT's Third Supplemental Answer to Interrogatory No. 14 that 'the termination letter was transferred by the former Registrar Sara Grijalva to the legal file in or about August or September of 2017.' Nor does she remember the exact date—or even an approximate date within a year or two—of her transfer of the copy of the termination letter to the secure file room.

(iii)   The . . . "associated communications" identified by Defendant NMT [were] indeed originally in Plaintiff's NMT academic files but then later transferred by Ms. Grijalva to the secure file room at the instruction of attorney Christa Hazlett.

(iv)    Ms. Grijalva also transferred other documents from Plaintiff's NMT academic files to the secure file room while she was Registrar of NMT.

Doc. 368 at 2–3.

The Court first addresses fact (ii) and Plaintiff's contention that, because Ms. Grijalva could not recall the date that she transferred the Termination Letter and related communications, Defendant NMT's sworn statement that the transfer happened in August or September 2017 must be a lie. *See id.* at 10–11. The Court does not agree with Plaintiff's logic. Defendant NMT may

have arrived at the timeframe of the transfer by other means than Ms. Grijalva's memory.  The

Court need not speculate on these means, however, because Defendant NMT's reasons for

ascertaining that the transfer was made in August or September 2017 are irrelevant.  There is

nothing to be gained by Plaintiff in establishing that the transfer was *not* made in August or

September 2017.  In fact, Defendant NMT's admission that the transfer was made after Plaintiff

initiated the present suit *supports* Plaintiff's theory that Defendant NMT did not transfer the

Termination Letter in the time required by the Settlement Agreement.  As Magistrate Judge

Wormuth reasoned,

> Defendant NMT has admitted and acknowledged, under oath and in several
> different contexts, that at least one copy of the termination letter was in Plaintiff's
> academic and/or administrative file more than five business days after execution
> of the Settlement Agreement.  If, as Plaintiff believes, the presence of the
> termination letter in his file after that time voided the Settlement Agreement, then
> no further evidence is needed to support his theory.  *Any prevarication about the
> specific date of transfer would be as pointless as it would be unethical.*

Doc. 353 at 12 (emphasis added).  The Court finds this reasoning fully persuasive and hereby

adopts it as its own.

Regarding the remaining facts brought to light by Ms. Grijalva's deposition, Defendant

NMT responds that, insofar as those facts are inconsistent with Defendant NMT's written

discovery responses, they are based on Ms. Grijalva's own personal knowledge and were

unknown to Defendant NMT until the time of Ms. Grijalva's deposition.  Doc. 383 at 4–7.

Defendant NMT explains that Ms. Grijalva left her position as Registrar in 2018, and therefore

Defendant NMT did not review its written discovery responses with Ms. Grijalva before sending

them.  *Id.* at 6–7; doc. 383-1 at ¶ 2.  Following Ms. Grijalva's deposition, Defendant NMT

further supplemented its written discovery responses to address the inconsistencies between its

prior responses and the information learned from Ms. Grijalva.  Doc. 383-7 at 1; doc. 383-2.

As Defendant NMT now explains it, Ms. Grijalva attempted to transfer the Termination Letter from the registrar's records to the designated legal file in accordance with the instructions of Ms. Hazlett (Defendants' counsel).  Doc. 383 at 6; doc. 383-1 at ¶ 4.  However, Ms. Grijalva was informed that the Termination Letter was already in the legal file and therefore the copy from the registrar's records was not needed.  Doc. 383 at 6; doc. 383-1 at ¶ 4.  Rather than destroy the letter, Ms. Grijalva placed it in her own personal collection of important papers. Doc. 383-1 at ¶ 4; doc. 369-1 at 6, 26:22–23.  Additionally, Ms. Grijalva placed several email communications regarding Plaintiff in the same collection of important papers.  Doc. 383-1 at ¶ 4.  These included email correspondence between Ms. Grijalva and Dr. Liebrock related to the Termination Letter and various email communications from Plaintiff.  *Id.* at ¶¶ 7, 10.  The correspondence between Ms. Grijalva and Dr. Liebrock was transferred to the personal collection of papers at the same time as the Termination Letter.  *Id.* at ¶ 9.  The email communications from Plaintiff were initially saved in the regular academic records, but Ms. Grijalva later moved them to her personal collection of papers.  *Id.* at ¶ 10.  Prior to her deposition, Ms. Grijalva never informed anyone of the contents of her personal collection of important papers.  *Id.* at ¶¶ 4, 7, 8.

The precise history of the transfer of the Termination Letter is muddled to say the least. It is thus somewhat understandable that Plaintiff, in his reply, misapprehends the import of Defendant NMT's revised version of events.  Throughout his reply, Plaintiff argues that Ms. Grijalva's actions could not have been unknown to Defendant NMT because they were taken on the instruction of Defendants' counsel, Ms. Hazlett.  Doc. 391 at 4–7.  Defendant NMT has revised its position that Ms. Grijalva acted on the instruction of Ms. Hazlett.  *See* doc. 383-2 at 3–5.  To restate Defendant NMT's position: Until it learned of the existence of Ms. Grijalva's personal collection of important papers, it believed that Ms. Grijalva transferred the Termination

Letter and related correspondence to a designated legal file, in accordance with the instructions of Ms. Hazlett.  Indeed, during her deposition, Ms. Grijalva herself suggested that this was the case.  Doc. 369-1 at 5, 23:21–24:3 ("Q: Ms. Grijalva, why did you transfer the termination letter to a legal file . . . ? A: I was instructed to do so. Q: By whom? A: By New Mexico Tech's attorney. Q: Krista Haslett? [sic] A: That sounds correct, yes.").  However, as questioning continued, it came to light that Ms. Grijalva did *not* transfer the Termination Letter to a legal file. *Id.* at 6, 28:15–17 ("Q: Ms. Grijalva, how many copies of the termination letter did you transfer to the legal file? A: None.").  Upon further questioning, Ms. Grijalva clarified, "It was my understanding at the time of removal from the Registrar file that a copy was already in the legal file and that was why my transfer was not—well, I transferred it out of the student file.  I did not transfer it to a legal file, because it was already in there." *Id.* at 6, 29:16–20.  In other words, Ms. Grijalva intended to transfer the Termination Letter to a legal file in accordance with Ms. Hazlett's instructions, but she was informed that it was unnecessary.  Instead, Ms. Grijalva transferred the Termination Letter to a personal collection of papers within the Registrar's office but separate from the customary academic records.  Thus, Ms. Grijalva did *not* act on the instructions of Ms. Hazlett, and neither Ms. Hazlett nor anyone else affiliated with Defendant NMT (other than Ms. Grijalva) knew of Ms. Grijalva's actions until her deposition.

As previously stated, the facts concerning the transfer of the Termination Letter are quite muddled.  However, none of the inconsistencies in this evidence merit departing from Magistrate Judge Wormuth's August 3 Order.  The Court again finds Magistrate Judge Wormuth's reasoning persuasive and hereby adopts it as its own:

> Defendant NMT has admitted in several different contexts that at least one copy of the termination letter was present in Plaintiff's academic and/or administrative file more than five business days after execution of the Settlement Agreement, and was moved to a legal file subsequent to the commencement of this suit. . . .

The hallmark of spoliation is that, because of the destruction or significant alteration of evidence, a party is unable to determine whether that evidence would have been helpful to its case.  *See, e.g., Browder v. City of Albuquerque*, 187 F. Supp. 3d 1288, 1299 (D.N.M. 2016) ("Because of the City's inadequate litigation hold, neither Plaintiffs nor the Court will ever know how important the cell phone may have been to Plaintiffs' case.").  In order for a court to impose spoliation sanctions there must be "meaningful evidence" that a party has been "actually, rather than merely theoretically, prejudiced" by the loss of the evidence. [*Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032–33 (10th Cir. 2007)]. . . . The situation here is . . . strikingly unprejudicial.  Not only is the information pertinent to Plaintiff's case—the presence of the termination letter in Plaintiff's academic and/or administrative files, long after execution of the Settlement Agreement—available to him by other means, it is positively admitted and undisputed.  To the extent that this constitutes a violation of the Settlement Agreement, therefore, Plaintiff has all the evidence he could possibly require. Indeed, it is difficult to imagine an appropriate adverse inference regarding this information that has not already been admitted.

Because no material evidence has been lost to Plaintiff by way of Defendant NMT's transfer of files, the Court finds that, for all practical purposes, no spoliation has occurred.  In the alternative, sanctions are inappropriate because there has been no actual prejudice to Plaintiff.  Moreover, Plaintiff has made no showing of the kind of intentionality necessary to support the particular sanctions he seeks.  [*See Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009) (citing *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997); *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1220 (10th Cir. 2008))].

Doc. 353 at 26–28 (footnote omitted).  The Court finds that the same reasoning applies equally to Ms. Grijalva's transfer of files to her personal collection.  A single point in the August 3 Order merits further discussion.  In a footnote, the Magistrate Judge explained that it did "not consider whether the continued presence of the 'associated communications' in Plaintiff's academic and/or administrative files would contribute anything additional to Plaintiff's case," because "[t]here is no evidence that these documents ever resided in Plaintiff's academic and/or administrative files at NMT."  *Id.* at 27 n.6.  It is now known that there were in fact communications related to the Termination Letter present in Plaintiff's academic files more than five days after execution of the Settlement Agreement.  Doc. 383-1 at ¶ 7.  To the extent that the

location of the related communications aids Plaintiff's case,[1] he now possesses sufficient evidentiary support.  The Magistrate Judge's reasoning on the Termination Letter now extends equally to the related communications.

There is a reason that more than one tool of discovery is available to litigants.  *Cf. Bartch v. Barch*, No. 18-cv-03016-MSK-NYW, 2019 WL 10255031, at *5 (D. Colo. Dec. 9, 2019) (unpublished)" (observing that a party is permitted to use multiple discovery tools even when they yield the same or substantially similar information).  Information may be imperfectly obtained through one tool but not another.  The deposition of Ms. Grijalva elicited information previously unknown to the parties.  Plaintiff might be dissatisfied with Defendant NMT's explanation for the discrepancies in their written discovery responses, but it *has* provided an explanation.  The Court finds no prejudice resulting to Plaintiff from having to rely on more than one discovery tool to obtain the information he sought.

Plaintiff cites *Lee v. Max Int'l, LLC*, 638 F.3d 1318 (10th Cir. 2011), to support finding prejudice and imposing sanctions.  Doc. 391 at 7–8.  In *Lee*, the Tenth Circuit affirmed dismissal as a sanction for the plaintiffs' failure to respond to the defendant's discovery requests despite two court orders compelling responses.  *Id.* at 1321.  In affirming the dismissal, *Lee* emphasized that discovery sanctions are within the district court's discretion.  638 F.3d at 1320 ("We view challenges to a district court's discovery sanctions order with a gimlet eye.").  The Tenth Circuit reasoned that the "district court's active participation in the discovery motions practice affords it a superior position than we—with but a cold record to review—for deciding what sanction best fits the discovery 'crime' . . . .'"  *Id.*  The same rationale can be applied to a district judge's review of a magistrate judge's discovery orders.  Magistrate Judge Wormuth has been

---

[1] The Court expresses no opinion as to the merits of Plaintiff's legal theory concerning the presence of either the Termination Letter or the related correspondence in his academic and/or administrative records.

thoroughly active in resolving the discovery disputes in this case.  It was Magistrate Judge Wormuth who ordered Defendant NMT not once but twice to supplement its responses to Plaintiff's discovery requests.  It was also Magistrate Judge Wormuth who determined that sanctions against Defendant NMT were not warranted on either occasion.  This decision was neither clearly erroneous nor contrary to law and therefore the Court will not disturb it.

## II.    Motion for Reconsideration [Doc. 385]

On July 16, 2020, Defendants filed a Motion to Quash Subpoena and for Protective Order and Notice of Non-Appearance.  Doc. 344.  Plaintiff, unsatisfied with Defendant NMT's sworn response that the transfer of the Termination Letter was made in August or September 2017, sought to depose Robin Goble to obtain a more precise transfer date.  Doc. 349 at 7–8.  Ms. Goble is a former attorney with Conklin, Woodcock, & Ziegler, P.C. (Defendants' counsel in this case) and the author of a legal memorandum regarding the transfer of the Termination Letter.  Doc. 344-2 at 2; Doc. 325-17 at 3.  Defendants objected to the deposition of opposing counsel and refused to make Ms. Goble available, to which Plaintiff responded that he "may need to depose" other attorneys of Conklin, Woodcock, & Ziegler, P.C. as well.  Doc. 344-3 at 2–3.  In their motion, Defendants sought to quash the subpoena on Ms. Goble and also requested a protective order to prevent the deposition of any present or former attorney with Conklin, Woodcock, & Ziegler, P.C., arguing that any relevant information possessed by such persons was obtained by virtue of the attorney-client relationship and is thus privileged.  Doc. 344 at 4–6.

On August 24, 2020, Magistrate Judge Wormuth issued an order granting in part and denying in part Defendants' motion (hereinafter, "August 24 Order").  Doc. 371.  Magistrate Judge Wormuth applied the standard set forth in *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986), and applied by the Tenth Circuit in *Boughton v. Cotter Corp.*, 65 F.3d 823

(10th Cir. 1995), to determine whether to permit the deposition of opposing counsel.  *Id.* at 5–6.

*Shelton* requires a party seeking to depose their opposing party's counsel to show that "(1) no

other means exist to obtain the information than to depose opposing counsel; (2) the information

sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the

case."  805 F.2d at 1327 (citation omitted).  Under *Shelton*, the Magistrate Judge found that

Plaintiff had not carried his burden of establishing the necessity of deposing opposing counsel.

Doc. 371 at 5–6.  Additionally, the Magistrate Judge rejected Plaintiff's contention that a

protective order could not be granted because the motion was untimely filed.  In pertinent part,

the Magistrate Judge found that the motion was not untimely because Plaintiff failed to properly

serve Ms. Goble with the subpoena for her deposition.  *Id.* at 6–8.  Plaintiff raises four objections

to the August 24 Order and further objects to the imposition of sanctions.  *See generally* Doc.

385.

Plaintiff's first objection is that the Magistrate Judge erred by treating Ms. Goble as

opposing counsel.  *Id.* at 4–5.  Plaintiff argues that Ms. Goble cannot be considered opposing

counsel because (1) Ms. Goble is not and never has been "attorney of record" for Defendants in

this case, and (2) Ms. Goble is retired from the practice of law.  *Id.* at 4.  Plaintiff's first

argument relies principally on the fact that Ms. Goble never entered a notice of appearance on

the case docket.  Plaintiff does not cite any authority for the proposition that an attorney-client

relationship exists only upon the filing of a notice of appearance on a case docket.  *See id.* at 4.

Whether an attorney-client relationship exists does not depend on any such technicalities.

Rather, the key inquiry is whether the attorney obtained confidential information from the client

that triggers the attorney's "ethical obligation of preserving confidential communications."  *Cole*

*v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1384 (10th Cir. 1994) (citation omitted).  Plaintiff's second

argument ignores the fact that attorney-client privilege survives the termination of the attorney-client relationship. *See, e.g., Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 440 (1977). Consequently, courts have extended the *Shelton* test to former counsel. *See, e.g.*, *Desert Orchid Partners, L.L.C. v. Transaction Sys. Architects, Inc.*, 237 F.R.D. 215, 220 (D. Neb. 2006). The only information Ms. Goble possesses relevant to this case is information she obtained in her role as an attorney with the firm that represents Defendants. Because her knowledge of this case was obtained in the context of an attorney-client relationship, it was proper to treat Ms. Goble as Defendants' counsel for purposes of Plaintiff's attempt to depose her.

Plaintiff's next objection is that the Magistrate Judge's application of *Shelton* was erroneous. The Court has reviewed the August 24 Order and agrees with the Magistrate Judge's reasoning, especially concerning the third requirement that the information be "crucial to the preparation of the case." *Shelton*, 805 F.2d at 1327. Quoting his own August 3 Order, Magistrate Judge Wormuth found that Defendant NMT's admission that the Termination Letter was in Plaintiff's academic and/or administrative files more than five days after execution of the Settlement Agreement was all the information that Plaintiff required to advance his theories. Doc. 371 at 6 (quoting Doc. 353 at 12). Plaintiff now attempts to explain why he considers the exact transfer date crucial. Plaintiff asserts that he is seeking to ascertain whether the transfer was made before or after the August 22, 2017 memorandum because, if the transfer was made before the memorandum, "then Defendants cannot rely on the memorandum (or any other contemporaneous attorney advice) in support of their attorney-client privilege and work-product doctrine defenses." Doc. 385 at 8. Plaintiff's meaning when he says that Defendants "cannot rely on the advice of counsel," *id.* at 9, is unclear. His only legal citation is to *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1436 (10th Cir. 1988). *See id.* at 8–9. *C.E. Carlson* was a securities

14

fraud case, in which the petitioners sought to defend against the SEC's imposition of sanctions by asserting that their actions were taken in good-faith reliance on the advice of counsel.  859 F.2d at 1431–33.  Reliance on advice of counsel is a defense often raised in SEC proceedings. *See id.* at 1436 (citing *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 467 (9th Cir. 1985); *SEC v. Savoy Indus.*, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981); *Sorrell v. SEC*, 679 F.2d 1323, 1327 (9th Cir. 1982); *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 181–82 (2d Cir. 1976); *SEC v. Bonastia*, 614 F.2d 908, 914 (3d Cir. 1980)).  Needless to say, this is not an SEC proceeding, and defenses that might be available in that context are not relevant here.  Nor is there any other apparent context in which Defendant NMT is asserting an advice-of-counsel "defense" to any claim brought by Plaintiff.[2]

Perhaps, what Plaintiff means is that Defendant NMT cannot invoke attorney-client privilege and/or work-product protection to prevent disclosure of discoverable material. Defendant NMT invoked these doctrines in response to Plaintiff's Interrogatory No. 15, which asked Defendant NMT to describe "in detail why and how the transfer of the [Termination Letter and associated communications] 'to a legal file' was 'pursuant to the terms of the Settlement Agreement.'"  *See* Doc. 385-4 at 4.  Defendant NMT ultimately responded that the transfer of the Termination Letter was undertaken upon the recommendations of counsel.  *Id.* at 5.  In his Motion for Discovery and Spoliation Sanctions, Plaintiff argued that Defendant NMT's response was deficient because Defendant NMT did not confirm that the recommendations of counsel

---

[2] In his response to Defendants' Motion for Rule 11 Sanctions, Plaintiffs makes vague references to "state and federal law that governs Plaintiff's academic and administrative files at NMT."  Doc. 404 at 5; *see also id.* at 6–7. Plaintiff does not cite any specific statutory provisions and the Court will not attempt to guess to what he refers. *See Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that courts have no obligation to make arguments or perform research on behalf of litigants).  For their part, Defendants state that they do not intend to raise a defense based on the date of the transfer.  Doc. 406 at 2.

were "contained in the August 22, 2017 memorandum."  Doc. 325 at 17.  In his August 3 Order,

Magistrate Judge Wormuth rejected this argument:

> Defendant NMT's privilege objection does not rise and fall with the specific
> source or date of its counsel's recommendations, i.e., their inclusion in the August
> 22, 2017 memorandum.  Rather, the critical point is that Defendant NMT's
> transfer of documents into Plaintiff's legal file was undertaken based on the
> recommendations of its counsel. . . . Because Defendant's actions were
> undertaken upon the advice of counsel, and because it is largely irrelevant how,
> where, or in what format that advice was communicated, its supplemented
> response to Interrogatory No. 15 is sufficient.

Doc. 353 at 17 (citation and internal quotation marks omitted).

The Court agrees with this logic.  Defendant NMT has certified under oath that the

transfer of the Termination Letter was initiated on the advice of counsel.  Doc. 385-4 at 5.

Whether or not that advice was first communicated in the August 22, 2017 memorandum,

Defendant NMT's answer remains the same.  Furthermore, it is unclear what Plaintiff believes

Defendant NMT is trying to hide by invoking attorney-client privilege and work-product

protection in this context.  As the Court stated previously, Defendant NMT's admission that the

transfer was effected in August or September 2017 only aids Plaintiff.  Doc. 353 at 12.  If, as

Plaintiff believes, the Settlement Agreement was rendered void by Defendant NMT's failure to

remove the Termination Letter from his academic and/or administrative files within five days of

execution of the Settlement Agreement, then Defendant NMT has handed Plaintiff a valuable

admission.[3]  And if, as Plaintiff believes, Defendants belatedly moved the Termination Letter in

an attempt to hide their noncompliance with the Settlement Agreement, then Defendant NMT's

admission that the transfer was made after this lawsuit was filed only bolsters that theory.[4]

---

[3] The Court reiterates that it is not presently deciding whether Plaintiff's theories concerning the transfer of the
Termination Letter have any merit.
[4] Aside from agreeing with Magistrate Judge Wormuth that sanctions against Defendants are unwarranted, the Court
expresses no opinion on the merits of this theory.

Still, Plaintiff is not satisfied.  He insists on finding a witness who can "confirm the veracity" of Defendant NMT's sworn statement that the Termination Letter was transferred to a legal file in August or September 2017.  Doc. 385 at 7–8.  No witness is required to orally confirm the veracity of sworn statements in a party's written discovery responses.  Even if the Court could see any legitimate purpose in permitting Plaintiff to continue his hunt for a witness who can give an exact date of transfer, it is doubtful that Plaintiff would take such a witness at her word.  To the best of the Court's knowledge, Plaintiff has accused most of the witnesses he has deposed of lying.  *See* Doc. 391 at 7 (accusing Ms. Grijalva of perjury); Doc. 388-10 at 2, 83:9–10 ("Q: Mr. Majumdar, because you have no integrity whatsoever, and a complete liar and a dishonest fool—" [sic]); Doc. 388-6 at ¶ 9 (declaration by Defendant Wells that Plaintiff suggested throughout his deposition that Defendant Wells was being dishonest); Doc. 405-1 at ¶ 7 (similar declaration from Dr. Liebrock); Doc. 361-2 at 2, 5:1 – 7 (alluding to "three or four incidents of perjury" by Defendants' counsel and/or Defendant Wells).

And Plaintiff is not done.  With his third objection, Plaintiff takes a rest from the question of the transfer date to unravel a conspiracy, the subject of which is a single line from the transcript of Ms. Grijalva's deposition.  Doc. 385 at 9–14.  When Plaintiff asked Ms. Grijalva why an email sent from Dr. Liebrock to Ms. Grijalva on May 1, 2012 was transferred from Plaintiff's academic files, the unedited transcript reads "Because David Hostutler instructed me to transfer it."  Doc. 385-2 at 6, 45:21.  On August 12, 2020, Ms. Grijalva submitted a correction, changing "David Hostutler" to "Christa Hazlett."  Doc. 385-5 at 2.  Ms. Grijalva stated, "I am certain I did not say David Hostutler in my answer.  I don't know anyone by that name."  *Id.* David Hostutler was a member of Plaintiff's dissertation committee at NMT.  Doc. 388 at 7.  The reason for the error is unknown, but Plaintiff has a theory:

> [A] possible motivation for such alternation might have been to protect Christa
> Hazlett, since the context in which her name was altered concerned the transfer of
> the [email correspondence related to the Termination Letter], which Defendant
> NMT and its counsel had previously certified under oath had never been
> transferred from Plaintiff's academic file but rather had always been in the legal
> file at NMT.

Doc. 385 at 12; *see* Doc. 385-4 at 3.  Bolstered by the suspected corruption of the transcript, Plaintiff asserts that he is entitled to depose Ms. Hazlett in order to "confirm if she was aware that Defendant NMT committed perjury" in its sworn discovery responses.  Doc. 385 at 13–14.

Before addressing the accusation of perjury, the Court takes a moment to observe a curious turn in Plaintiff's position.  As discussed above, on page 8 of his motion, Plaintiff theorizes that the transfer of documents from Plaintiff's administrative and/or academic records was *not* initiated on the advice of counsel and that Defendant NMT's contrary attestations are an improper attempt to hide the true reason for the transfer.  *See id.* at 8.  Now, on page 12, Plaintiff theorizes that the transfer of documents from Plaintiff's administrative and/or academic records *was* initiated on the advice of counsel and that Defendant NMT has colluded with the court reporter *to hide the fact that the transfer was on the advice of counsel*.  *See id.* at 12.  Plaintiff has lost the plot of his own conspiracy theory.

The execution of this conspiracy makes as little sense as the plot.  The uncorrected deposition transcript contains at least two instances where Ms. Grijalva identifies Christa Hazlett as the person who instructed her to transfer documents from Plaintiff's files.  Doc. 385-2 at 5, 23:5–24:3; *id.* at 6, 43:17–22.  Before Plaintiff filed the present motion, Ms. Grijalva corrected the transcript, going so far as to state that she doesn't know anyone by the name of David Hostutler.  Doc. 385-5 at 2.  It is unclear if Plaintiff thinks that Ms. Grijalva undermined the

conspiracy deliberately or merely by ineptitude.  The Court rejects Plaintiff's invitation to infer anything corrupt or deceptive from the transcript error.[5]

Regarding Defendant NMT's alleged perjury, the Court does not share Plaintiff's certainty that Defendant NMT's incorrect discovery response *was* perjurious.  "The elements of perjury are that a witness: (1) gives false testimony; (2) concerning a material matter; and (3) with willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  *United States v. Quarrell*, 310 F.3d 664, 682 (10th Cir. 2002) (citing *United States v. Smith*, 81 F.3d 915, 918 (10th Cir. 1996)).  Even if Plaintiff could prove that Defendant NMT's statement was willfully false, there is no basis to establish that it was material.  Defendants have already admitted that the Termination Letter was in Plaintiff's academic files more than five days after execution of the Settlement Agreement.  *See* Doc. 338-3 at 4.  Plaintiff does not explain what, if anything, the email correspondence adds to his case that is materially different from the Termination Letter.  It quite simply makes no sense to believe that Defendants have gone to such underhanded lengths to hide a fact that is no more damaging than the fact to which they have already admitted.

Plaintiff's fourth objection is to the Magistrate Judge's finding that Robin Goble was not properly served with the subpoena pursuant to Rule 45.  The Magistrate Judge made the following finding:

> Service of a subpoena on a non-party is accomplished by 'delivering a copy to the named person.'  Fed. R. Civ. P. 45(b)(1).  At a minimum, service must be made 'in a manner which reasonably insures actual receipt of the subpoena by the witness.'  *E.A. Renfroe & Co. v. Moran*, 2008 WL 1815535, at *5 (D. Colo. Apr.

---

[5] The Court makes this finding explicitly to cut short any further attempt by Plaintiff to invent conspiracies around this transcript error.  Having done so, the Court notes that the entire subject of Ms. Hazlett's theoretical deposition is improperly raised as an objection to the Magistrate Judge's August 24 Order.  The Magistrate Judge did not grant Defendants' request for a blanket protective order prohibiting the deposition of its counsel.  Doc. 371 at 9.  There was no preemptive bar to the deposition of Ms. Hazlett.

18, 2008) (citing *King v. Crown Plastering Corp.*, 170 F.R.D. 355, 356 (E.D.N.Y. 1997)).  Service here was made on Ms. Goble's former employer, two years after her employment there ended.  *Doc. 344-2* at 2.  As Defendants explain, the subpoena was delivered in an envelope addressed to Conklin, Woodcock & Ziegler, P.C., together with several other subpoenas for party and non-party witnesses.  *Doc. 361* at 2 n.1; *doc. 361-1*.  Plaintiff's own process server attests that these depositions were delivered 'in care of Irene Salazar at the law firm of Conklin, Woodcock, & Ziegler, P.C.'  *Doc. 349-4* at 2.  Plainly, the subpoena of Ms. Goble was not delivered 'to the named person.'  It was Plaintiff's responsibility to ensure that Ms. Goble would receive the subpoena, and he did not do so.  Because Ms. Goble was not properly served, the Court could not validly hold Ms. Goble in contempt under Rule 45 for her failure to appear.

Doc. 371 at 7–8 (footnotes omitted).  The Court cannot find any legal or factual error in the

Magistrate Judge's reasoning on this point.  Nevertheless, Plaintiff makes several arguments as

to why Ms. Goble was properly served.

Plaintiff's first argument is that Rule 45 does not require "personal, in-hand service."

Doc. 385 at 15.  The Magistrate Judge did not insist upon "personal service."  The Magistrate

Judge's only statement regarding the appropriate manner of service was to establish the *minimum*

requirement, i.e., "a manner which reasonably insures actual receipt."  Doc. 371 at 7 (citing

*Moran*, 2008 WL 1815535, at *5).  There are a variety of means short of personal service by

which a party might ensure that the subject of a subpoena will receive it.  Service to someone

without any present affiliation with the subject of the subpoena does not suffice.

Plaintiff's next argument is that "[b]y accepting service of Ms. Goble's subpoena, Ms.

Salazar in effect guaranteed that she would see that it was personally delivered to Ms. Goble."

Doc. 385 at 15.  Plaintiff cites no legal authority for this proposition, and the Court is certain

none exists.  If personal service is "in effect guaranteed" any time a person accepts a subpoena

addressed to another person, then Plaintiff might as well have effected service by giving it to his

next-door neighbor.  The Court cannot accept an argument that would permit such an absurd

result.  Plaintiff insists that service by way of Ms. Salazar was acceptable because Ms. Salazar

passed along subpoenas to "five other non-party witnesses—namely, Kenneth Minschwaner, Lorie Liebrock, Scott Teare, Bhaskar Majumdar, and Sara Grijalva." *Id.* at 16. To the best of the Court's knowledge, each of these witnesses is presently employed by Defendant NMT. *See id.* at 6; Doc. 400 at 13; Doc. 192 at 1; Doc. 383-1 at ¶ 2. There was no burden on Defendants' counsel in passing along subpoenas to its own client's employees. On the other hand, Defendants' counsel was not obligated to assist Plaintiff by reaching out to a retired employee to deliver a misdirected subpoena.

Plaintiff's third argument is that service on Defendants' counsel was proper because it has acted as Ms. Goble's attorney in this matter. Doc. 385 at 16. Plaintiff contends that the notice of non-appearance regarding Ms. Goble's deposition evinces an attorney-client relationship between Conklin, Woodcock, & Ziegler, P.C. and Ms. Goble, because a notice of non-appearance "can only be [filed] with the client's knowledge and consent." Doc. 386 at 2; Doc. 385 at 16. Plaintiff does not cite any legal authority to support his assumption that a notice of non-appearance can only be filed on behalf of a client. To establish the existence of an attorney-client relationship, a party "must show that (1) the client submitted confidential information to a lawyer, (2) with the reasonable belief that the lawyer was acting as his attorney." *Amaya v. Bregman*, No. 14-cv-0599 WJ/SMV, 2016 U.S. Dist. LEXIS 192333, at *9– 10 (D.N.M. Mar. 7, 2016) (unpublished) (citing *Cole*, 43 F.3d at 1384). An attorney's filing of a notice of non-appearance does not inherently require receipt of any confidential information, and Plaintiff does not otherwise establish that Ms. Goble submitted any confidential information to Defendants' counsel to aid this filing. Plaintiff has failed to establish that Ms. Goble was a client of Defendants' counsel.

Fourth and finally, Plaintiff argues that the notice of non-appearance "is irrefutable proof that [Ms. Goble] received her subpoena."  Doc. 385 at 16.  Again, Plaintiff provides no legal authority for this assertion.  As with his third argument, Plaintiff assumes that a notice of non-appearance can only be filed upon the instruction or consent of the non-appearing witness.  This does not appear to be correct.  *See E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, No. CIV-02-1644 JB/RJS, 2008 WL 2229553 (D.N.M. Feb. 14, 2008) (unpublished).  In *BCI Coca-Cola*, the E.E.O.C. filed notices of non-appearance and a motion for protective order to prevent the deposition of three non-party witnesses.  *Id.* at *6.  The court found that the E.E.O.C. had standing to bring the motion for protective order, even though the E.E.O.C. did not represent the witnesses, because the E.E.O.C. had its own interest in protecting its witnesses.  *Id.* at *8. Neither the court nor the parties considered the E.E.O.C.'s filing of notices of non-appearance as creating an attorney-client relationship.  In fact, it was precisely because the E.E.O.C. was not acting as counsel to the non-parties that the issue of standing was raised.  *Id.*

The purpose of Defendants' filing of the notice of non-appearance of Ms. Goble was to protect Defendants' attorney-client privilege.  *See generally* Doc. 344.  Following the reasoning of *BCI Coca-Cola*, Defendants had standing to file the notice of non-appearance for the protection of their own interests.  The Court finds no reason to believe that Ms. Goble had any knowledge of either the notice of non-appearance or the subpoena.  Plaintiffs' objections to the Magistrate Judge's finding that Ms. Goble was not properly served are inapposite, illogical, unsupported by legal authority, and wholly unavailing.

Lastly, Plaintiff objects to the Magistrate Judge's imposition of sanctions pursuant to Federal Rule of Civil Procedure 37(a)(5)(C).  *See* Doc. 385 at 17.  When granting a motion for protective order in part, the decision whether to award expenses "lies within the court's sound

discretion." *Sprint Commc'ns Co. v. Big River Tel. Co.*, No. 08-2046 JWL, 2009 WL 2176033, at *1 (D. Kan. July 21, 2009) (unpublished) (citation omitted).  The Magistrate Judge found that Defendants' motion was meritorious in all pertinent aspects and therefore awarded Defendants their expenses in briefing their motion.  Doc. 371 at 10–11.  None of Plaintiff's objections establishes that the Magistrate Judge's August 24 Order was either clearly erroneous or contrary to the law in any respect.  It follows that the imposition of sanctions in the form of Defendant NMT's expenses was a proper exercise of the Magistrate Judge's discretion.

## III.     Rule 11 Sanctions

Rule 11 cautions attorneys and unrepresented parties alike that, by "presenting to the court a pleading, written motion, or other paper," they certify to the best of their "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that the paper meets the following conditions:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

*Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1182 (10th Cir. 2015) (quoting Fed. R. Civ. P. 11(b)).  "In short, Rule 11 requires that a 'pleading be, to the best of the signer's knowledge, well grounded in fact, warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and . . . not interposed for any improper purpose.'"  *Id.* (quoting *Coffey v. Healthtrust, Inc.*, 1 F.3d 1101, 1104 (10th Cir. 1993)).

"In deciding whether to impose Rule 11 sanctions, a district court must apply an objective standard; it must determine whether a reasonable and competent attorney would believe in the merit of an argument." *Dodd Ins. Servs., Inc. v. Royal Ins. Co. of Am.*, 935 F.2d 1152, 1155 (10th Cir. 1991). "A good faith belief in the merit of an argument is not sufficient; the attorney's belief must also be in accord with what a reasonable, competent attorney would believe under the circumstances." *White v. Gen. Motors Corp.*, 908 F.2d 675, 680 (10th Cir. 1990) (citation omitted). Notably, Rule 11 "speaks of attorneys and parties in a single breath and applies to them a single standard." *McCormick v. City of Lawrence, Kan.*, 218 F.R.D. 687, 690 (D. Kan. 2003) (quoting *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 548 (1991)). Accordingly, a plaintiff proceeding on a pro se basis is equally subject to the requirements of Rule 11. *See Salmon v. Nutra Pharma Corp.*, 687 F. App'x 713, 718–19 (10th Cir. 2017) (unpublished) (imposing Rule 11 sanctions on pro se plaintiff); *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (citations omitted) ("This court has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants.").

"If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction . . . ." Fed. R. Civ. P. 11(c)(1). An "appropriate sanction" is one "limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." *Predator*, 793 F.3d at 1182 (quoting Fed. R. Civ. P. 11(c)(4)). In particular, "if imposed on motion and warranted for effective deterrence," the court may enter "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4).

On September 13, 2020, Defendants served on Plaintiff a motion for Rule 11 sanctions for the filing of Plaintiff's second motion for reconsideration (Doc. 385).  Doc. 400 at 1.  Twenty-one days elapsed without an indication from Plaintiff that he would withdraw his motion.  *See* Fed. R. Civ. P. 11(c)(2) (requiring 21-day safe harbor for withdrawing a challenged filing).  Defendants filed the instant motion on October 5, 2020.  Doc. 400.  Plaintiff filed a response on October 19, 2020, standing by his legal and factual contentions and asking the Court to award his costs in responding to Defendants' motion.  *See generally* Doc. 404.  Briefing was complete on this motion with the filing of Defendants' reply on November 2, 2020.  Doc. 406.

The Court finds that sanctions are warranted for Plaintiff's second motion for reconsideration.  The standard under which Plaintiff brought both[6] of his motions for reconsideration is "extremely difficult" to satisfy.  *See* 12 Wright & Miller, *Federal Practice and Procedure* § 3069.  The district court must affirm the magistrate judge's order unless it "is left with the *definite and firm conviction* that a mistake has been committed."  *Ocelot Oil Corp.*, 847 F.2d at 1464 (citation omitted) (emphasis added).  In more pungent terms, the Seventh Circuit has stated that the "clearly erroneous" standard is met only where a decision "strikes [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish."  *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988).  Plaintiff's arguments fall far short of this standard.  Defendants alerted Plaintiff to his failure to meet this standard in their response to his first motion for reconsideration.  Doc. 383 at 1–4.  Plaintiff's second motion for reconsideration was filed on the same day.  Doc. 385.  In response, Defendants again noted Plaintiff's failure to satisfy the requisite standard for Rule 72(a).  Doc. 393 at 1–4.  Neither of

---

[6] Defendants do not seek sanctions regarding Plaintiff's first motion for reconsideration, and the Court finds that sanctions are not warranted as to that motion.  However, Plaintiff's conduct regarding his first motion is relevant insofar as it demonstrates his persistent intractability.

Plaintiff's replies attempts to argue that he has met the requisite standard or even acknowledges Defendants' challenge on this point. *See generally* Doc. 391; Doc. 401.

Aside from the inapposite choice of mechanism for reconsideration, Plaintiff's legal contentions evince a total disregard for the necessity of conducting a reasonable inquiry into the applicable law – beyond those portions of the law that he finds most favorable to his own opinions. His factual contentions are internally contradictory and grounded more in hostile suspicion than in evidence. Finally, it is difficult to fathom a legitimate purpose for this motion, given that Plaintiff's arguments are largely immaterial to any dispositive issue in this case.

In evaluating Defendants' request for sanctions, the Court considers that Plaintiff is an unrepresented party with no apparent legal training. *See McCormick*, 218 F.R.D. at 690. The Court finds that Rule 11 sanctions are warranted in large part because Plaintiff received multiple warnings that his arguments were not legally sound and multiple invitations to correct, clarify, or withdraw them. His failure to meet the standard required by Rule 72(a) is but one example. His insistence that Ms. Goble was properly served is another.

On August 11, 2020, after Defendants filed their motion to quash the subpoena of Ms. Goble, Plaintiff filed a motion to hold Ms. Goble in contempt for her failure to appear at her unilaterally scheduled deposition. Doc. 359. In his August 24 Order, after holding that Ms. Goble was not properly served, Magistrate Judge Wormuth suggested that Plaintiff should withdraw his motion for contempt. Doc. 371 at 8 n.4. Prompted by the August 24 Order, Defendants offered their consent to Plaintiff's withdrawal of the motion. Doc. 372-1 at 2. Instead of rethinking the validity of his position, Plaintiff dug his heels in further, refusing to withdraw the motion for contempt and adding the second motion for reconsideration to his growing list of frivolous motions. *Id.* at 1; Doc. 385. On October 9, 2020, Magistrate Judge

Wormuth denied the motion for contempt, reiterating that Ms. Goble was improperly served and noting that "Plaintiff cannot evade this responsibility [i.e., to ensure proper service] by conscripting his opposing party's counsel into effecting service for him."  Doc. 403 at 5–6.  Ten days later, on October 19, 2020, Plaintiff filed a response to Defendants' Motion for Rule 11 Sanctions, stating that "Plaintiff unconditionally stands by . . . everything . . . he stated in his Motion for Reconsideration and related Reply."  Doc. 404 at 3 (citation omitted).  As this sequence of events illustrates, Plaintiff received multiple opportunities to investigate the applicable law, and he chose instead to entrench himself deeper within his legally unsupported position.

The Court also considers Plaintiff's purpose in filing this motion.  In both the August 3 and 24 Orders, the Magistrate Judge expressed puzzlement over what possible advantage Plaintiff hoped to achieve by continuing to pursue discovery into the transfer of the Termination Letter even after receiving Defendant NMT's admission that it was in his academic and/or administrative files for years after execution of the Settlement Agreement.  *See* Doc. 353 at 12; Doc. 371 at 10.  Plaintiff has had plenty of opportunities to resolve this confusion, and he has failed to provide an adequate explanation.  One can easily surmise from the overall theme of Plaintiff's motions, as well as his manner of conducting depositions, that Plaintiff's true purpose here is *not* to ascertain any particular fact at issue but to obtain either an admission from Defendants or a holding from the Court that Defendants have committed perjury.

The purpose of discovery is not to cultivate "gotcha" moments by which a party might obtain a favorable outcome by default.  "[T]he spirit of the rules is violated when advocates attempt to use discovery tools as tactical weapons rather than to expose the facts and illuminate the issues . . . ."  Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment.  "The

preferred disposition of any case is upon its merits and not by default judgment." *Gomes v. Williams*, 420 F.2d 1364, 1366 (10th Cir. 1970) (citing *Meeker v. Rizley*, 324 F.2d 269 (10th Cir. 1963)).  To the extent that Plaintiff has obtained material evidence by his exhaustive efforts, his reward must lie in using that evidence to advance his case.  He is guaranteed no more than that.

Having determined that sanctions are warranted, the Court must now consider what sanctions to impose.  Defendants request the following sanctions: (a) attorney's fees and costs associated with preparing and filing the instant motion for sanctions and their response to Plaintiff's second motion for reconsideration; (b) a monetary sanction separate from any award of attorney's fees; and (c) an admonishment and instruction from the Court to Plaintiff to "refrain from threatening witnesses or counsel, yelling at witnesses or counsel, and/or calling witnesses or counsel names."  Doc. 400 at 14, 15.  Although the goal of Rule 11 sanctions is deterrence, the Court is uncertain that any sanction will sway Plaintiff from his belief in his own rightness in these matters.  Nonetheless, the Court finds it proper to require Plaintiff to pay Defendants' costs, including attorneys' fees, incurred in responding to his second Motion for Reconsideration (Doc. 385) and in briefing their Motion for Rule 11 Sanctions (Doc. 400).

Additionally, in order to ensure that the parties' attentions from here on out are fully devoted to the *merits* of this case, the Court hereby warns Plaintiff against further attempts to transform this civil matter into a perjury trial.  Plaintiff is hereby warned that baseless accusations of perjury and/or threats of pursuing criminal charges for perjury may subject him to sanctions in the form of monetary fines to be paid to the Court.  "Baseless" accusations hereby include those referring to statements that do not "concern[] a material matter," *Quarrell*, 310 F.3d at 682.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Reconsideration of the Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Sanctions [Doc. 368] and Plaintiff's Motion for Reconsideration of the Court's Order Granting Motion to Quash Subpoena and Granting in Part Motion for Protective Order [Doc. 385] are **DENIED** and Defendants' Motion for Rule 11 Sanctions [Doc. 400] is **GRANTED**.

Defendants are hereby **DIRECTED** to file an application for attorney's fees and costs, including supporting affidavits and documentation, within ten (10) days of entry of this Memorandum Opinion. Plaintiff's objections, if any, must be filed within fourteen (14) days thereafter.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE